## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**FRANK DIETER,**

   **Petitioner,**

**v.**                              **Case No. 4:14cv130-RH/CAS**

**STATE OF FLORIDA,**

   **Respondent.**

_____/

## REPORT AND RECOMMENDATION TO DENY § 2254 PETITION

   On March 6, 2014, Petitioner Frank Dieter, proceeding pro se, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.   ECF No. 1.   On February 2, 2015, Respondent filed an answer, ECF No. 14, with exhibits, ECF No. 8.   Petitioner filed a reply on February 12, 2015. ECF No. 15.

   Within his reply, Petitioner requests the opportunity to file an amended § 2254 petition raising no new claims; Petitioner did not submit the amended § 2254 petition.   *See id.*; Fed. R. Civ. P. 15; N.D. Fla. Loc. R. 15.1(B) ("When a pleading may be amended only by leave of court, the amending party must file a motion for leave to amend and must simultaneously file the proposed amended pleading itself.").   This request is denied.

The matter was referred to the undersigned United States Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and Northern District of Florida Local Rule 72.2(B).   After careful consideration of all issues raised, the undersigned has determined that no evidentiary hearing is required for disposition of this case.   *See* Rule 8(a), R. Gov. § 2254 Cases in U.S. Dist. Cts.   For the reasons stated herein, the pleadings and attachments before the Court show that Petitioner is not entitled to federal habeas relief, and this § 2254 petition should be denied.

## Background and Procedural History

By information filed May 8, 2007, the State of Florida charged Petitioner Frank Dieter with two counts of sexual battery on a child under 12 years of age, Z.R., by a defendant 18 years of age or older, capital felonies in violation of section 794.011(2)(a), Florida Statutes, in connection with events that occurred April 21, 2007.   Ex. C at 11.[1]   Jury selection took place April 5, 2010, before Judge James C. Hankinson.   Ex. G. Dieter proceeded to a jury trial the next day, April 6, 2010, before Judge

---

[1]Hereinafter, all citations to the state court record, "Ex. –," refer to exhibits submitted with Respondent's motion to dismiss, ECF No. 8.

Case No. 4:14cv130-RH/CAS

Angela Dempsey.   Ex. H.   Dieter did not testify.   *See id.* at 305.   The jury

found him guilty as charged on both counts.   *Id.* at 397-98; Ex. C at 131-

32.   On April 14, 2010, the state trial court adjudicated him guilty and

sentenced him to two concurrent life sentences.   Ex. C at 135-43

(Judgment and Sentence); Ex. I (transcript of sentencing hearing).

Dieter appealed his judgment and sentence to the First District Court

of Appeal (DCA), assigned case number 1D10-2090.   The First DCA per

curiam affirmed the case without a written opinion on June 10, 2011.   Ex.

M; Dieter v. State, 63 So. 3d 753 (Fla. 1st DCA 2011) (table).   The

mandate issued on June 28, 2011.   Ex. N.

On January 23, 2012, Petitioner Dieter filed in the state trial court, a

Notice to Vacate Void Judgment, asserting he was never informed of the

"nature and cause" of his charges as required by the Sixth Amendment of

the United States Constitution.   Ex. O at 1-3.   Circuit Judge Mark Walker

considered the "notice," filed pursuant to Florida Rule of Criminal

Procedure 3.850, as baseless and denied the motion by order rendered

May 4, 2012, because Petitioner had been informed of the "nature and

cause" of the charges against him.   Ex. P.   Dieter did not appeal this

order.

On June 6, 2012, Dieter filed a pro se motion for post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.850, alleging claims of ineffective assistance of counsel.   Ex. Q at 1-47.   The state post-conviction court judge, Dawn Caloca-Johnson, dismissed the motion without prejudice on February 21, 2013, finding the motion failed to comply with the formatting requirements of Rule 3.850.   Ex. R.   Dieter filed another Rule 3.850 motion in state court on May 16, 2013.   Ex. U at 1-14. In an order rendered May 22, 2013, the court found his seven ineffective assistance of counsel (IAC) claims insufficient under Strickland v. Washington, 466 U.S. 668, 687 (1984).   Ex. U at 15-16.   In accordance with Spera v. State, 971 So. 2d 754 (Fla. 2007), and Nelson v. State, 977 So. 2d 710 (Fla. 1st DCA 2008), the court gave Dieter thirty days to sufficiently plead his motion.   *Id.*   Dieter submitted an amended motion on June 17, 2013.   *Id.* at 17-55.   In an order dated June 25, 2013, the state court found the IAC claims still facially insufficient, and denied the amended motion with prejudice.   *Id.* at 69-70.   The court explained under the Strickland standard, Dieter must show both deficient performance and

prejudice resulting therefrom, and "[n]one of Defendant's claims contain the required allegation of prejudice."  *Id.* at 70.

Dieter appealed to the First DCA, which affirmed the case, number 1D13-3521, without a written opinion on December 13, 2013.  Ex. V; Dieter v. State, 132 So. 3d 225 (Fla. 1st DCA 2013).  Dieter filed a motion for rehearing, Ex. W at 1-3, which the First DCA denied on February 12, 2014, Ex. X.  The mandate issued February 28, 2014.  Ex. Y.

As indicated above, Dieter filed a § 2254 petition in this Court.  ECF No. 1.  He raises seven grounds, all alleging ineffective assistance of counsel (IAC):

> (1)  IAC – During jury selection, defense counsel failed to object to improper comments by the prosecutor and made improper comments himself.  *Id.* at 4.

> (2)  IAC – Defense counsel failed to properly move to suppress Dieter's telephone confession.  *Id.*

> (3)   IAC – Defense counsel failed to cross-examine key State witnesses including the victim.  *Id.* at 5.

> (4)   IAC – Defense counsel failed to effectively question a key State witness during trial.   *Id.*

> (5)   IAC – Defense counsel failed to move for a mistrial after the prosecutor questioned the Child Protective Team nurse and "elicited expert opinion testimony" when the trial court

had not declared the nurse an expert.   *Id.* at 6.

(6)   IAC – Defense counsel failed to call a DNA expert as a
defense witness during trial.   *Id.* at 6.

(7)   IAC – Defense counsel failed "to raise and argue the many
inconsistencies in State's evidence."   *Id.* at 7.

Respondent filed a motion, with exhibits, asserting the petition should be

dismissed as untimely, ECF No. 8; the Court denied that motion, ECF Nos.

13 (Order) and 11 (Report and Recommendation).   Respondent

subsequently filed an answer.   ECF No. 14.   Dieter has filed a reply.

ECF No. 15.

## <u>Analysis</u>

Pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and

Effective Death Penalty Act of 1996 (AEDPA), federal courts may grant

habeas corpus relief for persons in state custody.   Section 2254(d)

provides, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a State court shall not
> be granted with respect to any claim that was adjudicated on
> the merits in State court proceedings unless the adjudication of
> the claim –
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in
the State court proceeding.

28 U.S.C. § 2254(d).   *See, e.g.,* Cullen v. Pinholster, 563 U.S. 170, 180-83

(2011); Gill v. Mecusker, 633 F.3d 1272, 1287-88 (11th Cir. 2011).   "This is

a 'difficult to meet' and 'highly deferential standard for evaluating state-

court rulings, which demands that state-court decisions be given the benefit

of the doubt.'"   Cullen, 563 U.S. at 181 (quoting Harrington v. Richter, 562

U.S. 86, 102 (2011), and Woodford v. Visciotti, 537 U.S. 19, 24 (2002)).

This Court's review "is limited to the record that was before the state court

that adjudicated the claim on the merits."   *Id.*

For claims of ineffective assistance of counsel (IAC), the United

States Supreme Court has adopted a two-part test:

First, the defendant must show that counsel's performance was
deficient.   This requires showing that counsel made errors so
serious that counsel was not functioning as the "counsel"
guaranteed the defendant by the Sixth Amendment.   Second,
the defendant must show that the deficient performance
prejudiced the defense.   This requires showing that counsel's
errors were so serious as to deprive the defendant of a fair trial,
a trial whose result is reliable.

Strickland v. Washington, 466 U.S. 668, 687 (1984).   To demonstrate

ineffectiveness, a "defendant must show that counsel's performance fell below an objective standard of reasonableness." *Id.* at 688.   To demonstrate prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.   "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*   For this Court's purposes, importantly, "[t]he question 'is not whether a federal court believes the state court's determination' under the Strickland standard 'was incorrect but whether that determination was unreasonable – a substantially higher threshold.'"   Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007)).   "And, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Id.*   It is a "doubly deferential judicial review that applies to a Strickland claim evaluated under the § 2254(d)(1) standard." *Id.*

### Ground 1:   IAC – Counsels' Comments During Jury Selection

In his first ground, Petitioner Dieter argues his trial counsel rendered ineffective assistance because he (a) failed to object to the prosecutor's

comments during jury selection, and (b) made improper comments himself.

ECF No. 1 at 4.   In particular, Dieter asserts that, during jury selection, the

prosecutor "made comments like:   '. . . wow, he looks pretty sad sitting

there, you know, I'm convinced that he did this but maybe he just made a

mistake." *Id.*   He further asserts defense counsel "made many improper

comments on just how 'cute' and 'beautiful' the alleged victim is and how

the jury will just love her and want to protect her as well as the child being

called a victim before a victim was proven." *Id.*   Dieter raised these

arguments in state court in his amended Rule 3.850 motion.   Ex. U at 22-

27; *see* Ex. U at 10; Ex. Q at 25-31.   As indicated above, however, the

state post-conviction court denied the claim as facially insufficient because

Dieter did not allege prejudice.   Ex. U at 69-70; *see* Ex. U at 15-16 (order

rendered May 22, 2013, striking Rule 3.85 motion as facially insufficient);

Ex. R (order rendered February 21, 2013, dismissing Rule 3.850 motion

without prejudice).   On appeal, the First DCA affirmed without an opinion.

These rulings are entitled to AEDPA deference and review is limited to the

record before the state court.   *See* 28 U.S.C. § 2254(d); <u>Cullen</u>, 563 U.S.

at 187-88; <u>Richter</u>, 562 U.S. at 99-03; <u>Wright</u>, 278 F.3d at 1255.

As the state court found, Petitioner Dieter did not allege any prejudice

that resulted from the alleged deficient performance of defense counsel.

Accordingly, pursuant to state case law, the state post-conviction court

summarily denied his claims with prejudice.   *See* Spera v. State, 971 So.

2d 754 (Fla. 2007); Nelson v. State, 977 So. 2d 710 (Fla. 1st DCA 2008).

Petitioner Dieter's claims thus appear procedurally defaulted and, because

he has not shown cause for and demonstrated prejudice therefrom, this

Court may decline to consider his claims.

Regardless of any default, his claims lack merit and may be denied.

A review of the record reflects defense counsel did not perform deficiently

and, even assuming he did, there is not a reasonable probability that, but

for the deficiencies, the result of the trial would have been different.

### (a)  Prosecutor's Comment During Jury Selection

In this portion of Ground 1, Dieter asserts defense counsel should

have objected when the prosecutor made the following statement:

> MR. HUTCHINS:   All right.   I know it's been a long day.   One
> of the things that you're going to hear on tomorrow, one of the
> instructions you're going to get from the judge is that as a trier
> of the facts in the case, you have to base your decision on the
> evidence and the evidence alone.   One of the things that you
> absolutely cannot do is let feelings of sympathy factor into your
> decision.
>
> Now, at some point today or some point tomorrow, you
> may look over at the defendant and you may think to yourself,

> wow, he looks pretty sad sitting there, you know, I'm convinced
> that he did this but maybe he just made a mistake.
> Understand you can't let feelings of sympathy factor into your
> decision.   Can't let feelings of sympathy for the defendant, and
> the flip side of that is you can't let feelings of sympathy for the
> victim either.   It's to the evidence and the evidence alone that
> you have to look in making your decision.   Can you all agree to
> do that?
>
> (Prospective jurors say yes.)

Ex. G at 64-65 (emphasis added).   Defense counsel did not object to this

comment, perhaps because, as set forth in detail below, he also wanted to

question the potential jurors about sympathy.

Even assuming defense counsel performed deficiently, however,

nothing indicates a reasonable probability the result of the trial would have

been different.   As explained more thoroughly in the analysis of the other

grounds, *infra*, the State's case included, among other things, a recorded

telephone call with law enforcement during which Dieter confessed to

touching the victim.   Ex. H at 269, 275-76.   Dieter's DNA (semen) was

found on the child's labia, underwear, and bed sheet.   *Id.* at 286, 290-93.

The child victim testified at trial that Dieter "sticked his pee in my pee" and

touched his finger "[i]n my pee-pee."   *Id.* at 117.   She testified his finger

was "[i]nside of me."   *Id.* at 118.   She also testified that, when he touched

her with "his pee-pee," it was inside of her.   *Id.* at 120.

### (b) Defense Counsel's Comments

Petitioner Dieter asserts his attorney provided ineffective assistance because he "made many improper comments on just how 'cute' and 'beautiful' the alleged victim is and how the jury will just love her and want to protect her as well as the child being called a victim before a victim was proven."   ECF No. 1 at 4.   A review of the jury selection transcript reveals a few instances where defense counsel described the victim while addressing potential jurors, in an effort to determine whether they could be objective and decide the case based on the evidence presented:

> MR. REMLAND:   . . . Now, Mr. Hutchins made reference to sympathy.   And, you know, one of the things you have to deal with is, you've got a real pretty little girl, she is adorable, she's cute as a button.   You're automatically going to love the little girl when you see her.
>
> And I want to ask you, [Prospective Juror], right?   This is difficult for anybody, for me, for Mr. Hutchins, for anybody when you look at the little child that's beautiful like that, an adorable child.   Can you set aside that and try to determine objectively what happened?   Or are you going to be swayed because she is a beautiful little child?   How do you feel about that?
>
> PROSPECTIVE JUROR []:   I think I would be able to be objective.
>
> MR. REMLAND:   Do you think you can be objective?
>
> PROSPECTIVE JUROR []:   (Nods head.)

MR. REMLAND:   It's natural.   That's why we talked about sympathy for people.   We are all humans.   We have compassion.   We're sympathetic.

Ms. [Prospective Juror], do you feel that you can put aside your feelings of sympathy because the child is cute because she is pretty and try to decide whether there's a possibility – whether she is reliable or not?

PROSPECTIVE JUROR []:   I would hope I could.   I think I could.

. . . .

MR. REMLAND:   I mean, you look at this little girl, she is absolutely adorable.   Cut the problem is, what happened? Can you analyze the issue of what happened without putting aside how pretty she is and how cute she is and all that?

PROSPECTIVE JUROR []:   Yes.

MR. REMLAND:   You feel you can do that?

PROSPECTIVE JUROR []:   Yes.

MR. REMLAND:   You know what I'm talking about?

PROSPECTIVE JUROR []:   Yes.   I absolutely know what you're talking about.

MR. REMLAND:   I mean, you might – would you think it would be fair that we have a natural reaction to embrace that child and to love that child and protect that child, right?

PROSPECTIVE JUROR []:   Right.

MR. REMLAND:   But we also have a need to figure out here clinically, like a doctor, what exactly happened, right?

PROSPECTIVE JUROR []:   Yes.

. . . .

MR. REMLAND:   And putting aside the natural feelings of affection and protection?

PROSPECTIVE JUROR []:   Yes.

MR. REMLAND:   And you don't have be a woman to feel that way, right, Mr. Pfeifer?

PROSPECTIVE JUROR []:   Right.

MR. REMLAND:   I mean, if you're a man and you see the cutest little girl you ever saw and she's seven years old, aren't you going to want to protect her?

PROSPECTIVE JUROR []:   Yes.

MR. REMLAND:   Do you feel that natural feeling?

PROSPECTIVE JUROR []:   Yes.

MR. REMLAND:   You see a little six or seven year old, right? Now, do you feel that that feeling that you've got about protecting the child is going to overcome your sense of objectivity?

PROSPECTIVE JUROR []:   No.

MR. REMLAND:   You sure about that?

PROSPECTIVE JUROR []:   Yes.

MR. REMLAND:   You've been around little children?

PROSPECTIVE JUROR []:   Yes.

MR. REMLAND:   They are cute, right?

PROSPECTIVE JUROR []:   Yes.

MR. REMLAND:   But you could put aside those feelings and look at the facts, the cold hard facts and make a determination as to whether the State has proven their case beyond a reasonable doubt?

PROSPECTIVE JUROR []:   Yes.   You have to hear both sides.

MR. REMLAND:   Okay.   Well, when you talk about both sides. Let's focus on one side right now, the State's side.   Because as Mr. Hutchins said and as the Court will instruct you, in a criminal case, Mr. Dieter, who is the citizen accused, he does not have to prove what happened.   Would you agree with that?

PROSPECTIVE JUROR []:   Right.

MR. REMLAND:   Would everybody agree with that?

(Prospective jurors say yes.)

MR. REMLAND:   Could you raise your hands if you agree with that everybody?   Thank you.   You do agree with that.

So in a sense, if someone is accused of a sexual assault on a child, especially <u>a child of small tender years who's adorable as can be</u>, the State still has to prove their case beyond a reasonable doubt.   Right, Ms. [Prospective Juror]?

PROSPECTIVE JUROR []:   That's right.

MR. REMLAND:   As a matter of fact, <u>the cuter the child, the smaller the child, probably the better the case</u>.   Would you say

that's fair, maybe?

PROSPECTIVE JUROR []:   A seven year old, yes.   It would be hard, but true.

MR. REMLAND:   It's hard but true.   It's hard but true.   You see the child walk in here and you naturally feel I want to protect that child, that's a beautiful child.   But you still have to figure out has the State proven its case beyond a reasonable doubt, correct?

PROSPECTIVE JUROR []:   It's the law.   That's true.

Ex. G at 85-91; *see* Ex. H at 42 (Defense counsel stated, in opening statement, "The trial is going to be taking probably a full day.   All I can ask you to do is pay attention to the evidence.   Please, you all promised yesterday that notwithstanding the beauty of the child – and she's cute as a button."   The prosecutor objected, arguing "[i]t's improper for him to be making reference to the child's beauty," and the judge overruled the objection.).

Thus, it appears defense counsel was attempting to ensure the jurors selected could decide the case based on the evidence presented and not be swayed by any sympathy felt for the child victim.   Even assuming defense counsel performed deficiently, nothing indicates a reasonable probability the result of the trial would have been different given the evidence included in the State's case, as referenced in the analysis of part

(a), *supra*, and more thoroughly analyzed in the remaining grounds, *infra*.

Based on the foregoing, Petitioner Dieter has not shown the state court's rejection of this ground was either (1) contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court precedent, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   *See* 28 U.S.C. § 2254(d)(1)-(2).   This ground should be denied.

### Ground 2:   IAC – Motion to Suppress Confession

In his second ground, Petitioner Dieter asserts defense counsel did not properly move to suppress the confession he made during a telephone call he initiated to the Sheriff's Department.   ECF No. 1 at 4.   Respondent answers that this claim is procedurally defaulted.   ECF No. 14 at 16. Respondent further asserts the claim lacks merit because Dieter did not identify any legal basis for a motion to suppress his non-custodial recorded telephone statements.   *Id.*

Respondent's position is well-taken.   The record reflects that, during the trial, Detective Todd Chaires, with the Leon County Sheriff's Office, testified that at the time of the incident, which occurred April 21, 2007, giving rise to the charges in this case, he was in the violent crimes unit.

Ex. H at 246.   He received a call on April 22, 2007, a Sunday, regarding

the Child Protective Team and the victim in this case, about the incident

which occurred the previous day.   *Id.* at 247.   He collected evidence from

the scene and got buccal swabs from the victim and Dieter.   *Id.* at 247-52.

Later in the week, on Wednesday, he received a call at the Sheriff's

Department from Dieter.   *Id.* at 252.   Chaires testified about the call:

> Q   And in that call, did he make statements that he had
> touched his best friend's wife – I'm sorry – that he had touched
> his best friend's child?
>
> A   That's correct, he did.

. . . .

> Q   Did he say that it had happened Saturday night?
>
> A   That's correct.
>
> Q   Okay, now, you've had an opportunity to listen to this
> taped statement; is that correct?
>
> A   I have.
>
> Q   Is it a fair and accurate description of the conversation
> that occurred between the defendant and the Sheriff's
> Department?
>
> A   It is.

MR. HUTCHINS [prosecutor]:   Your Honor, at this time absent
any objection from the defense, we would move to enter into
evidence – we don't have a sticker on it, but I believe it's what

is now State's 10 for identification.

THE COURT:   Any objection?

MR. REMLAND [defense counsel]:   I think we – yes, Your Honor.   I think there are – there are certain parts of that tape I think that are not admissible.

*Id.* at 252-53.   Counsel then conferred and agreed that a certain portion of the tape could be played.   Notably, defense counsel stated, "I think there's one part of it dealing with him touching the victim.   And I think that, you know, I – it's obviously not custodial and Miranda doesn't apply, and he called so I can't really object to that."   *Id.* at 254.   The prosecutor indicated he did not want to play any of the tape other than that one part, "I'm just going to play the relevant portions where he makes the admissions and confessions about touching the victim."   *Id.*   The recording was published for the jury and included the following:

> A   Okay.   Here – here's the whole thing.   You're probably recording this.   Here's the whole thing.   I – I touched a girl.   She was underage; she was five years old.   It was her best friend's daughter.   They go to church together.   It happened Sunday night – no, Saturday night.   I get a deputy showing up at my work on Monday afternoon.   He had a few questions for me.   At that time I went over to my father-in-law's house – I mean my father-in-law's father (unintelligible).   And they – they said that, you know they had some questions about a couple of children, which was the son – brother and sister.   I didn't touch the brother.

Q   You did what?

A   I did not touch their son.

Q   Okay.

A   The father-in-law told them that, you know, he used to be on the force and he knows they wanted to question me. They wanted me to come down and, you know, answer some questions.

Q   Uh-huh.

A   He said – at that time, he said I can talk to a lawyer, because he knows for a fact if I would have went down there for questioning, they would have arrested me.   Okay?   And no one knows what's going on except for the people trying to find out information.   And I have had a guilt complex the last couple days.   I knew – I know what is going to happen.   Other people didn't know what – her father did, her mother did, no one else. So they're all thinking that, you know, they're trying to make up this story.   That I did with my wife until tonight.   She went to church.   She found out.   She called me up and said they said that you touched her daughter, that she wanted to know the truth (unintelligible).   At that point she hung up.   Her father called from the church and told me I would have to leave the house.

Q   Okay.

A   That his daughter was in his office, which I did. Javier, as soon as I called, he's a friend of mine, and he started talking to me.   And I said, you know, I don't know what to do.   I mean, realistically this is what's going to happen.   I'm going to jail five, ten years.   I don't know.

. . . .

> Q   I mean, do you – do you – do you know that you're
> going to go for that long?
>
> A   Dude, I touched a five-year-old girl.
>
> Q   I understand that.
>
> A   I'm going to jail.   There's no question about that. . . .
>
> . . . .
>
> A   I have no idea why I touched this little girl.   I – I – I
> just don't know.   I did it.   I got caught. . . .

*Id.* at 269-75.   Detective Chaires identified Dieter as the individual who

called him.   *Id.* at 277.   Chaires testified that no one from the Sheriff's

Department had called Dieter, and Dieter was not in custody.   *Id.* at 268.

Dieter freely and voluntarily called the Sheriff's Department and made

those statements.   *Id.*   Thus, as defense counsel indicated on the record,

the decision in <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), did not preclude

admission of the recorded statements.   Thus, a defense objection, if made,

should have been overruled.   *See* <u>Miranda</u>, 384 U.S. at 477-79 ("The

principles announced today deal with the protection which must be given to

the privilege against self-incrimination when the individual is first subjected

to police interrogation while in custody at the station or otherwise deprived

of his freedom of action in any significant way. . . . Any statement given

freely and voluntarily without any compelling influences is, of course,

admissible in evidence. . . . There is no requirement that police stop a

person who enters a police station and states that he wishes to confess to

a crime, or a person who calls the police to offer a confession or any other

statement he desires to make.   Volunteered statements of any kind are not

barred by the Fifth Amendment and their admissibility is not affected by our

holding today." (footnote omitted)).

Based on the foregoing, Petitioner Dieter has not shown the state

court's rejection of this ground was either (1) contrary to, or involved an

unreasonable application of, clearly established U.S. Supreme Court

precedent, or (2) based on an unreasonable determination of the facts in

light of the evidence presented in the state court proceeding.   *See* 28

U.S.C. § 2254(d)(1)-(2).   This ground should be denied.

### Ground 3:   IAC – Cross-Examination of State Witnesses

In his third ground, Petitioner Dieter asserts defense counsel

rendered ineffective assistance by not cross-examining key State

witnesses, including the victim, the victim's mother, and Detective Todd

Chaires.   ECF No. 1 at 5.   Respondent answers that this claim is

procedurally defaulted and, further, lacks merit.   ECF No. 14 at 16.

Indeed, as Respondent suggests, even considering the merits of the claim, defense counsel appears to have used reasonable trial strategy in not cross-examining these witnesses.   *See* ECF No. 14 at 16-18. Defense counsel's theory was, given the absence of DNA in the child's vagina, there was not sufficient evidence of penetration.   Regarding the child victim, who was five years old at the time of the offense and eight years old at the time of the trial, given that Dieter's DNA (from semen and saliva) was found on her labia, panties, and bedsheets (but not in her vagina), and given Dieter's recorded statements made during the phone call with the Sheriff's Department, any questioning by defense counsel of the child or her mother would have risked offending the jury.   *See* Ex. H at 87-94 (mother's trial testimony); 114-25 (child's testimony).   Defense counsel did raise four objections during the child's testimony on direct, and the court sustained three of them.   *See id.* at 115, 118-19, 121.   Defense counsel also objected twice during the mother's testimony on direct, and the court sustained one objection.   *See id.* at 91-92,

Regarding Detective Chaires, given the theory of defense, it is not clear what Dieter believes defense counsel should have asked.   *Id.* at 245-77.   Chaires testified regarding the evidence collected and the recorded

phone call with Dieter, and defense counsel did successfully limit the portions of the recorded call that were played to the jury.

Based on the foregoing, Petitioner Dieter has not shown the state court's rejection of this ground was either (1) contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court precedent, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   *See* 28 U.S.C. § 2254(d)(1)-(2).   This ground should be denied.

### <u>Ground 4</u>:   IAC – Cross-Examination of Key State Witness

In his fourth ground, Petitioner Dieter alleges trial counsel provided ineffective assistance by not cross-examining "a key State witness."   ECF No. 1 at 5.   In particular, Dieter asserts that during the trial, outside the jury's presence, "counsel questioned a very important witness on the witnesses 'quizzing' the child before she made her initial statement to police" but "[w]hen the jury was brought back in, there was nothing said of the 'quizzing' of the alledged victim."   *Id.*

Respondent answers that, as with the previous grounds, this claim is procedurally defaulted.   ECF No. 14 at 18.   Respondent further asserts the claim lacks merit.   *Id.*

Petitioner Dieter does not identify this "key State witness" by name.

*See* ECF No. 1 at 5.   As Respondent indicates, Dieter appears to refer to

Reece Wayne Langston.   *See* ECF No. 14 at 18; Ex. H at 50-86.

The record reflects the prosecutor called Mr. Langston to testify as

the second witness.   Ex. H at 50.   Langston testified he works at

Champion Chevrolet and also teaches Sunday School; he knows the

victim, the victim's family, and the defendant.   *Id.* at 50-51.   The victim,

Z.R., was in his Sunday School class on April 22, 2007, the day after the

incident giving rise to the charges in this case.   *Id.* at 51.   Langston

testified Z.R. was not her "normal self" that day and questioned her about

what was wrong.   *Id.* at 51-51.   At that point, defense counsel objected to

the introduction of child hearsay statements.   *Id.* at 52.   At the ensuing

bench conference, the prosecutor explained that he had previously filed a

motion regarding the introduction of the child hearsay statements made to

Mr. Langston, as well as the CPT tapes and statements made to the

mother.   *Id.* at 52-53.   The prosecutor explained a hearing had taken

place but he did not "know if it was ever ruled on."   *Id.* at 53.   The judge

stated she did not think there was a written order, directed that the jury

leave the courtroom, and then discussion occurred among the judge and

the attorneys, after which the judge stated the prosecution had given notice to the defense, but the statements Z.R. made to Langston had not been addressed at the previous hearing.   *Id.* at 53-57.   The judge directed the prosecutor to question Langston about the statements (particularly including that "she told him that the defendant touched her where she pee-pees with where he pee-pees," *id.* at 56), in a proffer, and allow defense counsel to ask questions.   *Id.* at 57.   The prosecutor questioned Langston during the proffer:

> Q   What did [Z.R.] say?
>
> A   Well, I questioned her about what was going on and then she final told me that she could not tell me anything.   And so then I just kept asking her why – off and on, she would be back around.   And I said, why can't you tell me?   She said, well, I'm just not allowed to tell.
>
> And then she told me that Mr. Frank had said she could not tell anybody.   And I said, what do you mean?   Let me back up.   First, she told me that Mr. Frank woke her up, the reason she was sleepy was because he woke her up and she couldn't sleep.
>
> And then, wondering what was going on there, that he was there, I said, why would he wake you up?   And I had to ask her several times.   And she finally said, well, I'm not allowed to tell, Mr. Frank said I could not tell.
>
> So, at that point I told her that people – that you can't keep secrets from people that aren't your family, that that was not – he couldn't say that, you don't keep secrets from your

mom and dad.   And I said, this is something that you need to tell, you know, people that aren't your parents aren't allowed – adults aren't allowed to tell you that you can't keep secrets.

And so, then a little while later, she came back and she said that Mr. Frank had woke her up and that he had touched her pee-pee with his pee-pee.

Q   Now, you never made any suggestions about any sexual abuse to the child, is that correct?

A   That's correct.

Q   You just kind of were asking her what happened?

A   It was more of an inquisitive thing, where I just kept – I asked her over because she was not – she was not her normal self.   I mean, like I said, she's a very affectionate child.   But she was not only being that way, she was very lethargic, just very non-emotional.

*Id.* at 57-58.   Defense counsel cross-examined Langston, during the

proofer, about quizzing the victim:

Q   She talked to you – she didn't want to talk to you and then you kept on talking to her, you said you coaxed her and you quizzed her?

A   No, I did not say "coaxed."

Q   You said quizzed her or something like that, right?

A   That's correct.

Q   And then –

A   I did the same thing I would do to my own children or

grandchildren in a discussion.   When they clam up, are not saying something and I feel something's wrong, I'm going to be inquisitive enough just to give them the opportunity.   Not coaxing or browbeating or anything like that, but just a normal discussion that I would have with any child that happened to be in my Sunday school class or my grandchildren, you know.   I'm not an expert, but I am a grandfather and you do have perceptions.

. . . .

Q   Do you know what a leading question is?   Did you repeat what she said several times?

A   I did not repeat what she said at all.   She told me and at that point I left the room.   I got up, I got her and the other children that were playing, I said, y'all need to come with me.   I went across the hall to another teacher.   I said, something has come up, it's an emergency, you need to take care of these children.   And then I went straight to her grandmother, who happened to be with our pastor.

Q   So as soon as she said those words, touch pee-pee with pee-pee, that was it –

A   We were done.

Q   You're done, right?

A   Yes, sir.

*Id*. at 62-64.   After argument of counsel, the judge found the

circumstances demonstrated the reliability of the statement.   *Id*. at 69-70.

The jury came back and Langston's testimony continued on direct, as in the

proffer.   *Id*. at 79-82.   Defense counsel then cross-examined Langston as

follows, in its entirety:

> Q   So she used the word "touched," right?
>
> A   That's correct.
>
> Q   Touched her pee-pee with his pee-pee?
>
> A   Correct.
>
> Q   She was five years old at the time, correct?
>
> A   Correct.
>
> Q   And that's everything she said, right?
>
> A   That is correct.

*Id.* at 83.

Now, Petitioner argues defense counsel should have questioned Langston about "quizzing" Z.R., as he did during the proffer.   The proffer, however, was for the judge to determine whether the statements were sufficiently reliable to be admissible as evidence under the Florida child hearsay statute, section 90.803(23).   Given Langston's response during the proffer cross-examination questions about "quizzing" the victim, perhaps defense counsel did not want to emphasize that Langston was "[n]ot coaxing or browbeating or anything like that, but just a normal discussion that I would have with any child that happened to be in my

Sunday school class or my grandchildren."   Instead, defense counsel emphasized the "touch" portion of the child's statement, presumably because, as a matter of strategy, this supported the defense position that Dieter only "touched" her and no penetration occurred.   Moreover, Langston's testimony about the victim's statement was cumulative to other evidence in the record, including the victim's statements to her mother and the CPT tape.

Based on the foregoing, Petitioner Dieter has not shown that the state court's rejection of this ground involved an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts.   *See* 28 U.S.C. § 2254(d)(1)-(2).   This ground should be denied.

### Ground 5:   IAC – No Motion for Mistrial

In his fifth ground, Petitioner Dieter asserts his trial counsel provided ineffective assistance because he did not move for a mistrial "after the prosecutor elicited expert opinion testimony from the CPT nurse" when she "plainly stated there were no injuries to the child's vagina, after an alleged penetration around 12 hours later, but went on to state that she believes the incident had occurred because she read studies."   ECF No. 1 at 6.

Dieter indicates the trial court had "never declared her an expert in anything." *Id.*

Respondent answers that, as with the previous grounds, this ground is also procedurally defaulted.   ECF No. 14 at 19.   Respondent further asserts this ground lacks merit.   *Id.*

The trial transcript includes the testimony of Lynn Steele, the CPT nurse practitioner.   Ex. H at 138-73.   Steele testified that she is "a sexual nurse examiner" and she does "forensic exams on children 18 years and under."   *Id.* at 142-43.   She "collect[s] any evidence if there is evidence" and she does "a full physical exam and diagnose[s] if there are any problems . . . that need medical attention."   *Id.* at 143.   She was called by the Child Protection Team and examined Z.R. on April 22, 2007.   *Id.* at 143-44.   She described the exam.   *Id.* at 144-147.   In particular, she testified:

> Q   What, if anything, did you notice about the – well, let me ask you, did you examine the victim's hymen in this case?
>
> A   Yes.
>
> Q   Okay.   What, if anything, did you notice about that?
>
> A   I wrote down that the hymen type was circular, unremarkable, no injury.

Q   Okay.   You noted no injury?

A   Correct.

Q   Okay.   Now, are you aware of any studies where children have been examined and you find no injuries, but for other reasons you know abuse has occurred, because maybe you have a videotape of the person molesting or raping the child?

A   I know of studies that have been done that have – that have been documented, lots of studies that have been done by Joyce Adams, a very well-known doctor in this field who has done numerous studies, and it's – the findings are it's normal to be normal.

Q   Okay.   So, essentially, just because you didn't find any evidence of injury to a five-year old child, that does not mean that sexual abuse did not occur?

A   Correct.

Q   And could you tell us again approximately how many times that you have had occasion to conduct these types of examinations?

A   Over the past nine and half years, I – I'm guessing, ballpark, a couple of hundred.

Q   Do, in many of these cases, you find that there's no evidence of injuries to the child?

A   The majority of the cases that I have done, there have been no injuries.

*Id.* at 146-47.   In addition, Steele testified:

Q   Now, I guess you note in your report that the results of

the examination neither confirm nor negate the allegation of sexual abuse in this case?

  A Correct.
  Q Is that typical of the findings you usually make in most cases?

  A Yes.

*Id.* at 146.

Defense counsel objected when the prosecutor offered Steele as an expert in the field of child sexual examinations, and the judge ultimately ruled, "I never declare anyone an expert.   It's not an appropriate thing to do."   *Id.* at 158; *see id.* at 139-42, 156-58.   Defense counsel objected when the prosecutor offered Steele's report into evidence, and the judge sustained the objection, finding the report cumulative.   *Id.* at 149-56.   In particular, during the bench conference, the judge read a sentence from the report:

> THE COURT:   In this case, I'm going to find that it's cumulative under 403.   And the – the one sentence that Mr. Remland [defense counsel] has been focusing on, on page four, let me just read it into the record in its entirety.
>
> ["]Since most types of sexual abuse leave no physical findings, this examination should not be viewed as evidence that sexual abuse did not take place.["]
>
> I clearly think that is inadmissible opinion testimony.   So based on that sentence and the cumulative nature of the

document in this case, I'm going – I'm going to sustain the defense objection.

*Id.* at 155-56.   Defense counsel also extensively cross-examined Steele, eliciting testimony from her, as on direct, that in most cases she does not find any physical evidence and this "neither negates nor confirms sexual abuse" and, in this case, she indicated in her report that the findings of her physical exam were "unremarkable."   *Id.* at 163-64; *see id.* at 161-71.

Based on the foregoing, Petitioner Dieter has not shown his counsel performed deficiently or that he was prejudiced by any allegedly deficient performance.   Contrary to Petitioner's assertion, Ms. Steele did not at any point testify that she "believes the incident had occurred"; rather, as set forth above, she testified that, based on her experience, the absence of physical evidence "neither negates nor confirms sexual abuse."

Petitioner Dieter has not shown that the state court's rejection of this ground involved an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1)-(2).   This ground should be denied.

### Ground 6:   IAC – Failure to Call DNA Expert at Trial

In his sixth ground, Petitioner Dieter asserts his trial counsel provided ineffective assistance because he did not call a DNA expert, William

Watson, at the trial.   ECF No. 1 at 6.   Petitioner indicates his counsel had

obtained this expert for a motion hearing held October 30, 2009, and he

"proved to be a very qualified expert in DNA."   *Id*.   Petitioner asserts

counsel "never called said expert [at the trial] to refute [the] State's DNA

expert, leaving Petitioner in the hands of a prosecutorial expert in DNA,

giving him no chance of a fair trial."   *Id*.

Respondent answers that that, as with the previous grounds, this

ground is also procedurally defaulted.   ECF No. 14 at 20.   Respondent

further asserts this ground lacks merit.   *Id*.

A review of the record reflects that defense counsel filed a pretrial

motion to exclude the DNA evidence from the labial swab, challenging its

reliability under Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).   Ex. C

at 94-97.   In the motion, defense counsel specifically explained that

"Defendant does not challenge DNA evidence generally," but, rather, "he

challenges the scientific basis for admitting the particular type of DNA

evidence at issue in this case," involving the labial swab.   *Id*. at 94.

Defense counsel further explained that "defense expert, William Watson,

informs the Defense that such small quantities of DNA used in the test

indicate that the testing belongs to a subset of DNA analysis called Low

Copy Number (LCN) DNA analysis" and "are associated with multiple testing issues." *Id.* at 95. Defense counsel asserted, "Absent proof of a procedure that includes the amplification of DNA in the limited quantities used in this case and adequate validation demonstrating the reliability of this procedure, the LCN DNA analysis performed in this case cannot be accepted as reliable and would not be considered to be generally acceptable in the scientific community." *Id.* at 96.

A hearing took place on the motion on October 30, 2009. Ex. D (transcript of motion hearing). At the motion hearing, defense counsel called Mr. Watson, who testified as an expert in the area of forensic DNA. *Id.* at 13, 21. Watson testified via telephone from Tennessee. *Id.* at 5, 12-13. He testified that LCN DNA analysis "is testing of DNA quantities that are below approximately 200 picograms of DNA, either standard DNA testing techniques or modified DNA testing techniques." *Id.* at 23. He explained that "[i]t's a new application to an established testing process," *id.*, and "[t]he issue here is really more about the amount of DNA that you're starting with, to analyze," *id.* at 24. In particular, he testified:

> Well, the standard STR analysis, that's performed by the most laboratories in the United States now, targets about half a nanogram up to about two nanograms of DNA. And with low copy number DNA analysis you're looking at much less, in

some instances, as much as 1/10th of the amount of DNA as you would see in standard STR analysis.   And so it's really an issue of how much DNA goes into the test.

*Id.* at 26.   He further testified:

Q   Now, for years, DNA testing has become more and more sensitive.   Why is going down to this level of DNA a problem?

A   Well, there are several issues that come up when you start cutting the amount of DNA down below what's called the stochastic limit.   And most of the issues that come up potentially, result in hair or in your interpretation.

You can get what's called drop in.   Those are peaks that are spurious peaks; they just appear out of nowhere.   They are not really related to the evidence.

You can get allelic dropout.   That is where peaks that expected to appear, given the source of the sample, fail to show up.

You can see peak height imbalance.   At a (inaudible) when you have two peaks there are what we would call heterosygus.   And it is actually possible to appear – or for one of those peaks to be half as high as the other speak [sic], or disappear entirely.   Then you can also get some by-products related to what's called stutter – which again, they are spurious peaks that are related to the alleles that are present, but they are not actual types.

And you can get what's called plus four stutter, minus four stutter, minus four stutter, minus eight stutter.   And the upshot of all this is that there are a lot of these artifacts that can crop up, that can impact the interpretation of the data.   And that's entirely because of the amount of DNA that's placed into the sample.

Q   So there are many issues related to the efficacy of using
LCN testing that need to be revolved [sic]?

A   Yes, I would say that there are quite a new [sic].
. . . .
        . . . . All of the issues that I just mentioned relate to the
interpretation of the data and how testing low levels of DNA can
effect the ultimate profile that's generated.   So, you know, as a
community we really have come together and said, these are
the issues you have to address. . . .

*Id.* at 27-29.   Watson testified LCN testing is not generally accepted in the

forensic community.   *Id.* at 29.   Watson testified LCN testing "was actually

rejected in California – I believe it was a California court – as recently as

March" and "it has come under review in specific cases in Great Britain,

Canada and Australia."   *Id.* at 30.   Watson testified regarding validation in

general, and that he was not provided information from the Florida

Department of Law Enforcement (FDLE) regarding its validation

documentation, "[b]ut to my knowledge, I don't believe that they have

validated a low copy number DNA analysis process."   *Id.* at 32.   He was

not provided material regarding the FDLE low copy number DNA analysis

procedure or interpretation guidelines.   *Id.*   He further testified:

Q   And also, recognizing that there are some advocates of low
copy number DNA analysis, based on your review of the
material in this case, can you tell the Court if FDLE followed
recommendations made by proponents of low copy number
DNA testing?

A   From the documentation I have, it appears that they did not.

Q   And in fact, the FDLE file on DNA testing was sent to you through our discovery process.   Correct?

A   That is correct.   I have reviewed what I understand is the entire file related to the case.

*Id.* at 32-33.   Watson identified three issues concerning LCN DNA testing:

Q   Now, also in what ways did they vary from the recommendations of the low copy number analysis proponents?

A   Well, there are three primary ways that I would say – or three primary issues related to low copy number DNA testing. That is, it does not appear that they adjusted their interpretation guidelines to address issues with low copy number testing.

Q   When you say that, you're talking about FDLE in this case?

A   Yes, that's correct.   It's been demonstrated that again, when dealing with low, low quantities of DNA you can get increased artifacts that can actually impact the one that the profile looks like.   And so you really have to adjust the interpretation again, based on your validation, in order to deal with those problems.   That's the first issue.

The second issue was that they did no[t] perform replicate testing, at least as far as I can tell –

Q   Wait a second.   What –

A   -- as far as the documentation I have. What that means is --

Q   Replicate?

A   -- all of the proponents of low copy number DNA testing out there right now, and even some of its tractors, have all said that if you're going to attempt this you really need to do replicate testing – that is, test the sample multiple times.   And that's to address the stochastic issues that I talked about.   That's where a peak can appear that should not be there or a peak can disappear that should be there.

So if you tested had multiple times, you take what's called a consensus sequence between the different runs and then you can report that.

And then, they did not test the reference samples on the alleged victim.   And, to me that's one of the bigger issues here, I mean in addition to admissibility, because without testing the victim there is no way to say whether or not the profile that was generated from a labial swab came from the victim or not, because they didn't test the victim.

So, regardless of what profile they were able to generate, you can't say that at least part of that profile didn't come from the victim.   And if it did, then it could confuse the interpretation, significantly.

*Id*. at 33-35.   Watson testified further regarding the FDLE testing of the

labial swab:

Q   So when all is said and done, do you believe that the testing performed by FDLE is not generally accepted?

A   What I would say is the testing on the labial swab did not meet, from the results I believe, would not be generally acceptable in the forensic community.   Now the profile they generated for your client was fine.   The amount of DNA that went into that was well within the acceptable range.

But as far as the sample that's at question here, the labial

swab, again, based on the documentation I've seen I would say no.   It does not meet what would be considered generally acceptable.

Q   Even among labs that are proponents of the testing he actually did not follow the recommended guidelines?

A   Again, there was no replicate testing.   And you know where they may have validated the process I haven't seen the validation, so I have to assume it doesn't exist.   And it does not appear that they modified their interpretation guidelines in any way.   So again, I would say no, that it does not appear that they undertook or implemented the sort of minimal requirements to meet the recommended guidelines by people that feel like it should be implemented.

Q   Among labs that are not performing low copy number DNA analysis they did not follow general guidelines since they did not type the alleged victim to exclude them from any possible mixture?

A   That's correct.   I mean, again, you know even if there was a suitable amount of DNA from a labial swab to be able to get a better profile, it would still be a recommendation to type the alleged victim for comparison purposes, if for no other reason than to show that there's not another potential contributor – another potential male contributor in that sample.

Again, from the documentation I have, it does not appear that they typed the alleged victim in this case.   So I would say no, it probably wouldn't meet what would be generally acceptable, even if it wasn't low copy number testing.

*Id.* at 38-39.

On cross, Watson testified he was "not intimately aware of what [the FDLE] current standard operational procedures are."   *Id.* at 41.   He further

testified on cross:

> Q   But, you are aware that the operating procedures have
> been validated.   Is that correct?
>
> A   Again, I know that they were validated some number of
> years ago.   I couldn't speak to whether or not they are
> validated at this time.   But it's my understanding they are
> currently accredited.   If it's been reviewed recently – their
> accreditation – then, part of that review would be a review of all
> the validations that they have.
>
> Q   And that review is done by an outside course, it's not
> internal.   Is that correct?
>
> A   Yes, it's done buy [sic] ASCLAD Lab. . . .

*Id.* at 41-42.   The judge also inquired of Mr. Watson:

> THE COURT:   Okay.   And you said that some courts have
> rejected LCN.   Are you aware of any that have accepted it?
>
> THE WITNESS:   Am I aware of laboratories that have
> accepted it?
>
> THE COURT:   I said courts.
>
> THE WITNESS:   Oh, courts.   Not under that name.   In other
> words, I'm not aware of any court that has come out and said,
> low copy number DNA analysis is generally accepted in the
> forensic community and can be applied, you know, in this
> jurisdiction.
>
> I am aware though, of cases where the amount of DNA
> that was tested fell into the low copy number range.   And those
> cases have been adjudicated and the data has been used.
>
> . . . .

THE COURT:   Do you know what states those cases occurred in?

THE WITNESS:   Well, I think New York.   And I mean I have to do a little bit of research, I can certainly do that if you would like, Your Honor.   I'm not aware of any others for sure, right off the top of my head.

*Id.* at 43-44.

The State then called Suzanne Livingston, a senior Crime Laboratory Analysis with the FDLE crime lab in Tallahassee, who testified as an expert in the field of DNA analysis.   *Id.* at 47-48, 50.   Ms. Livingston testified that the procedures utilized by FDLE have been validated and she explained what is involved in the validation of the procedures at the crime lab.   *Id.* at 50-51.   She testified that she has been doing DNA testing at FDLE since the early 1990s and, in this case, she followed the standard operating procedure and that is the same procedure that is used by all analysis conducting DNA testing at FDLE.   *Id.* at 51, 55.   She further testified she did not believe this case involved low copy number DNA testing:

Q   Now, did you do anything special regarding low copy number testing in this case?

A   No, because I don't believe this is low copy number testing.
Q   What is the basis of your expert opinion that this is not low copy number?

> A   First of all, there is no consensus in the forensic community as to what low copy number DNA testing is.   We apply the same criteria in looking at our data and interpreting our data. Based on our validation studies, based on our experience with this type of testing, nothing is changed.   I have done this case the same way I have done every DNA case that I have done since I began and every other analyst has done since they have been doing DNA.

*Id.* at 51-52; *see id.* at 53-55.   She testified regarding not testing the

victim's DNA because the victim is female and the DNA came from sperm,

a single source and male:

> Q   Now, Mr. Watson made a statement earlier, regarding not testing the victim's DNA in this case.   Does profile on the sperm fraction – is from a single male source.   Is that correct?
>
> A   In my opinion, it is from a single source and that source is male and therefore, it could not be the victim who is female.

*Id.* at 55.   Defense counsel cross-examined her regarding her statement

this was not a low copy number DNA case:

> Q   You heard Mr. Watson testified that due to this small amount of the DNA in the case, the number of pictograms being what it was, that it was a low copy case?   Yet, you're saying that it's not a low copy case?
>
> A   There is no consensus as to what a low copy number DNA is.   And in fact, in my experience in reading the articles that I have dealt – you know, in the literature, it deals more with extending cycles and changing the parameters of the test than necessarily the amount of input DNA.   Also, as I stated before, the quantitation system that we use is not perfect.   And to say it was precisely 75 picograms or 100 picograms is not

necessarily accurate.    It is an estimation.

Q   But, isn't it true, as he indicated, that when you're dealing with small amounts of DNA like this, you have got these problems of reliability that require validation according to the sources?

A   And they have been validated because this is the same procedure we have used since we started STR testing at FDLE.

Q   So you're saying that the regular validation procedures you've used in the past, the way you've used them are good enough – no extra validation procedures need to be employed for lower copy number DNA?

A   It's not lower copy number DNA.   We have been using this amount of input DNA since we began doing DNA testing and therefore, it was validated with precisely these amounts.   Our interpretation guidelines were written with these amounts in mind and therefore, there is nothing new about this procedure.

Q   So you're saying the amount of DNA in this case, it's not low, it's not smaller?

A   It is low, but we have taken those into account in our validation.   We have taken those into account our interpretation guidelines and nothing has changed.   As I say, since we have begun to do SCR testing we have been using input amounts this low.   Or, as I said, I have had quantitations that say zero and I come up with a perfectly beautiful profile. So therefore, this isn't anything new.   It's not low copy number; we're not just starting to do this.   We have been doing this from the beginning.

*Id.* at 56-57.

Defense counsel called Mr. Watson again, in rebuttal.    *Id.* at 63.

Watson testified that he disagreed regarding the need for special testing

procedures and that this is a LCN case.   *Id.*   He testified, "[W]e haven't

reached the consensus about what should be done with samples that fall

down into this range."   *Id.*   He testified there was more than one definition

for LCN DNA analysis and "I guess that I would agree that there isn't a

consensus in the sense that exactly what low copy number analysis hasn't

been defined, other than to say it tends – it's related to the level of DNA

where you start to see those stochastic issues."   *Id.* at 66.   He further

testified:

> Well, in conclusion again, certainly I know that the FDLE
> has a very good process in-house and I don't have any
> questions that they followed the procedures that they have
> outlined.   My issue is that I don't believe the procedures that
> they currently have are sufficient to deal with – again, as I recall
> them, which is pretty limited – but I don't believe that they are
> sufficient to deal with the amounts of DNA that fall into the
> range that we are talking about.
>
> . . . .
>
> The laboratories that do routinely test DNA at this level
> interpret it and then put forward arguments that low copy
> number DNA testing should be used.   The procedures that
> were used by FDLE don't match those procedures in that again,
> there was no replicate testing and the interpretation guidelines
> didn't account for the potential for increased stutter and early
> (inaudible) dropout and those kinds of things.
>
> So again, I'm not criticizing the work that the FDLE does

in the sense that their procedures for standard STR analysis are certainly very good.   But, I'm not sure that those procedures were adequate to the amount of DNA that we are dealing with in this case.   So, I would say that I don't feel like the results are reliable.

*Id.* at 66-67.

The judge found Ms. Livingston's testimony credible and "of course Ms. Livingston testified that this is not even an LCN case."   *Id.* at 80.   The judge, among other things, pointed out that "at least one of the things that Mr. Watson mentions, that the victim wasn't tested in this case – it clearly seems like that was not necessary because the sample is that of a male and not of a female."   *Id.*   The judge concluded that "the procedures employed in this case are generally accepted by the scientific community and that the results in this case meet the standard of Frye."   *Id.*

Subsequent to this, it appears defense counsel was still considering using Mr. Watson as a witness at trial as he mentions him, and his availability during possible trial dates, during another motion hearing that took place November 10, 2009.   Ex. E at 9.   Discussion also occurred during that hearing about additional DNA testing, which defense counsel states "could change my whole theory of the case, depending on what the evidence is."   *Id.*   At a hearing on December 16, 2009, defense counsel

mentions faxing the results of the DNA testing of the bedsheets to Mr. Watson "so we know what it says and let him look at it."   Ex. F at 4.

At trial, Ms. Livingston testified as an expert witness in the field of DNA analysis.   Ex. H at 282-300.   She testified that she received a couple of submissions in this case, for DNA testing.   *Id.* at 285.   She first received a sexual assault evidence kit with two items that came from the victim, Z.R., vaginal swabs and labial swabs.   *Id.*   She also received buccal swabs from Petitioner.   *Id.* at 285-86.   From her testing, she found semen on the labial swabs and developed "just a partial profile because there was very little material there" as there was only a small amount of semen.   *Id.* at 286.   She compared the partial profile to Petitioner and "it did match his profile."   *Id.* at 287.   She generated a report about this first submission in July 2009.   *Id.* at 285.   She testified that she received another submission in this case, which included a pillow case, a yellow bed sheet, a pink coverlet, a pair of children's green underwear, a T-shirt, and buccal swabs from the victim.   *Id.* at 290.   She found semen on the bed sheet, the coverlet, and the underwear.   *Id.*   She developed a profile that "matched Mr. Dieter at 13 markers," which is every single marker, for the bed sheet.   *Id.* at 291.   For the underwear, she testified that "on 11

markers, I could determine precisely what the DNA profile of the male

contributor of the semen was, and those 11 markers matched Mr. Dieter."

*Id.* at 292.   She testified that she generated a report about this second

submission, which included the sheet and the underwear, on December 15,

2009.   *Id.* at 293.

On cross, defense counsel questioned Ms. Livingston about the two

reports.   *Id.* at 294-96.   He clarified there was no semen found on the

vaginal swabs.   *Id.* at 296.   He also clarified that the labial swabs had only

a small amount of material to test:

> Q   The labial swabs had a little bit of semen on it, and you say
> less, and you're a scientist, you know about numbers, you said
> a few cells; is that right?
>
> A   Yes.   What I look for when I identify semen is spermatozoa.
> Those are the male reproductive cells.   And that in fact is
> where the male DNA would be in a semen stain that I actually
> get the profile from.
>
> Sometimes just the amount of semen deposited may
> have maybe more, and therefore have lots of spermatozoa, and
> therefore lots of DNA.
>
> If I'm looking at something on which there was less
> semen collected and less spermatozoa, I would not anticipate
> getting a full profile because I have less to work with.
>
> Q   So a few cells, is that – how do you quantify that?   Is that –
> are we talking about – I think I've heard the term pictogram or
> something like that.

A   Well, picogram is a – is an actual weight.   And, yes, I'm dealing with picogram amounts, and that's again why I get such small – I didn't get a full profile.

Q   All right.   And so we're talking about the labial swab, not a full profile, a picogram or less, a couple of cells.   Is that what we're talking about here?

A   Well, it's not –

Q   Microscopic –

A   It's not less than a picogram.

Q   Okay.   Is it something we couldn't see with the visible eye and we're talking microscopic here?

A   Well, you can't see spermatozoa with the visible eye. Unless you look at them under a microscope, you can't see them swimming around.   They're very small.

Q   But that's the amount – the amount of spermatozoa, the amount of semen on the labial swab is something that we require a microscope to see?

A   Spermatozoa require a microscope to see whether there's one or 300 million of them.

Q   All right.   Was there a much greater amount of semen found on the sheets and panties compared to the labia swab?

A   They were visible standing on both the sheets and the panties.   And when I looked microscopically at the extract that I made from the stains on the panties and the sheet, I saw more spermatozoa than I saw of the extract that I made from the swab.

*Id.* at 296-98.

Based on the foregoing, the <u>Frye</u> hearing during which Mr. Watson testified took place after the first DNA submission (the vaginal and labial swabs) but before the second submission (which included the sheet and underwear).   It seems reasonable to conclude that, as the case developed, with more DNA that matched Petitioner found on the underwear and bedsheet, defense counsel decided Mr. Watson's testimony was of limited or no use, particularly given the defense theory in the case – that no penetration or union occurred.   His cross-examination of Ms. Livingston regarding the small amount of testable material found on the labial swab, and the absence of DNA on the vaginal swab, is consistent with the defense trial strategy.

Similar to Dieter's argument in Ground 4, *supra*, he argues in this ground that defense counsel should have countered the State's DNA evidence with testimony from Mr. Watson, as he did pretrial.   Mr. Watson's earlier testimony, however, concerned the admissibility of the DNA evidence and occurred at a pretrial hearing held on the defense motion to exclude the evidence, which at that point only involved only the labial swab, not the underwear or bedsheet, as those items had not yet been tested.

At the conclusion of the Frye hearing, the judge found the evidence admissible, however, and explained that at least some of the concerns identified by Watson were not present here because the child victim was female and the DNA sample was from sperm (so the victim's DNA could not be confused with the DNA sample).   Indeed, given the subsequent testing of the bedsheet and underwear, and that there was no factual dispute that the DNA on the labia swab was from sperm and the defense theory of the case was that no union or penetration occurred (consistent with finding no sperm in the victim's vagina), defense counsel had no apparent need to call an expert in this area during the trial.   He could, and did, advance the theory of defense with his cross-examination of the State's DNA expert.

Petitioner Dieter has not shown that the state court's rejection of this ground involved an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1)-(2).   This ground should be denied.

**Ground 7:   IAC – No Challenge to Inconsistencies in State's Case**

In his seventh ground, Petitioner Dieter asserts defense counsel provided ineffective assistance by "failing to raise and argue the many

inconsistencies in State's evidence."   ECF No. 1 at 7.   As supporting

facts, Dieter alleges:

> Counsel failed to argue to the jury that the child's initial
> allegation was penetration of the child's vagina by Petitioner's
> penis.   But at a motion hearing held Oct. 30th, 2009, the child
> stated the Petitioner did not penetrate her vagina, but that he
> did penetrate her butt, which was not examined by CPT.   The
> second issue is the charge of union.   The child stated
> Petitioner "slobbered" all over his penis and stuck in her vagina.
> Slobber is spit.   Spit is DNA.   The child stated she had not
> bathed or wiped her vagina at all, it was around 12 hours later
> that she was examined, where's the DNA.   Counsel failed to
> argue this to the jury.

*Id*.   As with previous grounds, Respondent answers that this ground is

procedurally defaulted and also lacks merit.   ECF No. 14 at 22.

A review of the record reflects that at the October 30, 2009, motion

hearing, the child victim did testify that Petitioner "touched his PP to [her]

PP" and he stuck "his PP inside [her] bottom."   Ex. D at 95.   She also

testified that he did not "stick his PP inside of [her] PP."   *Id*. at 103.   At

trial, the victim testified:

> Q   Okay.   What did he do when he woke you up, [Z.R.]?
>
> A   He said don't tell anybody and he sticked his pee in my pee
> and –
>
> Q   You say he stuck where he pee-pees in where you pee-
> pee?

A   Yes.

Q   Okay.   Did he ever touch you with his finger?

A   Yes.

Q   Where did he touch you with his finger?

A   In my pee-pee.

Q   Okay.   Now, did he do anything to his finger before he touched you with his pee-pee?

A   Yes.

Q   Or with his finger before he touched you in your pee-pee with his finger?

A   Yes.

Q   Could you tell us what he did?

A   He slobbered on it.

Q   When you say he slobbered on it, do you mean like spit on it?

A   Yes.

. . . .

Q   Did he slobber on his pee-pee, too?

A   Yes.

. . . .

Q   How did he touch you with his finger, [Z.R.]?   Was it inside

of you or was it outside of you?

A   Inside of me.

Q   So he actually stuck his finger inside of you?

A   Yes.

. . . .

Q   [Z.R.], when he touched you with his pee-pee, did he touch you on your thigh?

A   No.

Q   Okay.   Could you please tell the people where exactly he touched you?

A   On my pee.

Q   Where you pee-pee?

A   Yes.

. . . .

Q   Okay.   When he touched you with his pee-pee, was it inside you?

A   Yes.

Ex. H at 117-20.   Petitioner appears to complain here that defense counsel

did not point out inconsistencies in the victim's pretrial testimony and trial

testimony (by argue the victim testified at the motion hearing that he

penetrated her bottom and did not penetrate her "PP," whereas at trial, she

testified that he touched her inside), presumably in an effort to assert the child made inconsistent statements.   As indicated above, in the analysis of Ground 3, defense counsel did not cross-examine the child at trial and such would be necessary to point out any inconsistencies between her testimony at the motion hearing and her trial testimony.   As explained above, this decision appears reasonable given the defense theory of the case and the risk of offending the jury.   Further, it is reasonable to conclude that defense counsel declined to point out any inconsistencies because such would involve a big risk of giving the jury an opportunity to consider that penetration actually did occur, whether with the child victim's "bottom" or "PP."

Petitioner also complains that if he had "'slobbered' all over his penis and stuck it in her vagina," DNA would have been found in the victim's vagina.   As explained above, however, defense counsel did repeatedly emphasize, in the examination of witnesses, as well as in his argument to the judge, that none of Petitioner's DNA was found on the vaginal swab. *See, e.g.*, Ex. H at 296, 302, 362-66.   In particular, during defense counsel's closing, he argued using almost the exact words Petitioner's asserts he should have used:

Ladies and gentlemen, this DNA report supports a reasonable doubt because it simply says that the swabs do not show vaginal penetration and vaginal union.

The swab from the girl's DNA, the swab that was touched on the outside – remember what the – the nurse said.   She took that swab and she went around the outside area of the vaginal canal and the hymen, and nothing – and then she sent it to the lab.   What better evidence would there be?

What about semen?   There is none.

What about saliva?   You know, saliva is a biological fluid. If you spit on something, that's your DNA.   That's your DNA, ladies and gentlemen.   The little girl said he slobbered all over his finger, and he put it in her vagina.   He slobbered all over his penis and he put it in the vagina.   The nurse who examined the girl said she did not bathe.   She did not wash. Remember?

And they examined her.   The put the swabs in there, and there was no DNA from Mr. Dieter on the swabs, from saliva, semen or anything.

*Id.* at 364-65.

Petitioner Dieter has not shown that the state court's rejection of this

ground involved an unreasonable application of clearly established federal

law or that it was based on an unreasonable determination of the facts.

*See* 28 U.S.C. § 2254(d)(1)-(2).   This ground should be denied.

## Conclusion

Based on the foregoing, Petitioner Frank Dieter is not entitled to federal habeas relief.   The § 2254 petition (ECF No. 1) should be denied.

## Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."   Rule 11(b) provides that a timely notice of appeal must still be filed, even if the court issues a certificate of appealability.

Petitioner fails to make a substantial showing of the denial of a constitutional right.   28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483-84 (2000) (explaining substantial showing) (citation omitted). Therefore, the Court should deny a certificate of appealability.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."   The parties shall make any argument as to whether a certificate should issue by objections to this Report and Recommendation.

Leave to appeal in forma pauperis should also be denied.   *See* Fed. R. App. P. 24(a)(3)(A) (providing that before or after notice of appeal is filed, the court may certify appeal is not in good faith or party is not otherwise entitled to appeal in forma pauperis).

## Recommendation

It is therefore respectfully **RECOMMENDED** that the Court **DENY** the § 2254 petition (ECF No. 1).   It is further **RECOMMENDED** that a certificate of appealability be **DENIED** and that leave to appeal in forma pauperis be **DENIED**.

**IN CHAMBERS** at Tallahassee, Florida, on October 27, 2016.

S/ Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2).   A copy of the objections shall be served upon all other parties.   A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.   Fed. R. Civ. P. 72(b)(2).   Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.   If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a Report and Recommendation, that party waives**

the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.   *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.